937 P.2d 417

**Richard L. KESSLER and Cheryl L. Kessler, husband and wife, Plaintiffs–Appellants,**

v.

**TORTOISE DEVELOPMENT, INC., an Idaho corporation, Defendant–Respondent.**

No. 22635.

Supreme Court of Idaho,
Twin Falls, March 1997 Term.

May 1, 1997.

Lloyd J. Webb (argued) and Curtis R. Webb, Lawyers, Twin Falls, for plaintiffs–appellants.

Roark, Rivers, Baxter & Phillips, Hailey, for defendant–respondent. Ray Keith Roark argued.

JOHNSON, Justice.

This is a real estate contract case. The primary issue presented is whether provisions in the contract preclude the buyer from obtaining specific performance when the seller fails to consummate the sale. We conclude the contract is ambiguous concerning the availability of specific performance. Because of this disposition of the primary issue, we also vacate the judgment granting the seller restitution and return of the premises and a writ of possession.

**I.**

**THE BACKGROUND AND PRIOR PROCEEDINGS**

In 1991, Richard and Cheryl Kessler (Kessler) and Gerald Kingen (Kingen) purchased real property (the property) in Ketchum, Idaho, on which they planned to develop a

theater and restaurant complex (the complex). In 1993, Geoffrey Bushell (Bushell), a real estate broker, formed Tortoise Development, Inc. (Tortoise) to construct the complex.

In April 1994, Tortoise contracted with Avery Construction, Inc. (Avery) for Avery to construct the complex.

In July 1994, Kessler and Tortoise signed a preprinted form real estate purchase and sale agreement (the purchase agreement) in which Kessler agreed to purchase the theater unit (the theater) in the complex. The purchase agreement states that Kessler deposited and Tortoise acknowledged the deposit of earnest money, which was also to serve as a down payment. The purchase agreement sets December 15, 1994 as the closing date of the purchase and provides that Kessler is entitled to possession "upon completion of the shell."

The portion of the purchase agreement entitled "DEFAULT" (the default provision) addresses only the seller's remedies upon buyer's default and does not address the buyer's remedies upon default by the seller. The portion of the purchase agreement entitled "EARNEST MONEY" (the earnest money provision) provides, in part:

> If all conditions have been met by Buyer, Buyer and Seller agree that the earnest money (less credit report fees, and any other Buyer's costs) shall be refunded to Buyer in the event Buyer or Seller cannot consummate the sale due to circumstances beyond their control.

The portion of the purchase agreement entitled "TITLE INSURANCE" (the title insurance provision) provides, in part:

> It is agreed that if the title of said premises is not marketable, or cannot be made so within thirty (30) days after notice containing a written statement of defects is delivered to the Seller, or if the Seller, having approved said sale fails to consummate the same as herein agreed, the earnest money shall be returned to the Buyer and Seller shall pay for the cost of title insurance, escrow and legal fees, if any.

Avery started construction of the complex, but in late July 1994 stopped working on the job and filed a lien against the property because Tortoise had not paid Avery.

On August 16, 1994, Bushell transferred the ownership of Tortoise to Kingen. Tortoise then negotiated the resumption of construction by Avery and obtained financing for the construction of the complex.

On August 23, 1994, Tortoise and Kessler signed an addendum to the purchase agreement (the addendum), stating that the earnest money to which the purchase agreement referred had not been received by Tortoise, and that the earnest money is a credit given to Kessler based on Kessler's original interest in the property. In the addendum, the closing date is changed to February 15, 1995, and Kessler reserves an option to continue the closing to no later than May 15, 1995.

Construction was not complete on February 15, 1995, and Kessler exercised the option to continue the closing to April 14, 1995. Tortoise was capable of delivering marketable title to the theater on February 15, 1995.

By January 1995, Tortoise had made nearly all the payments due to Avery, but construction was not complete. In February 1995, Tortoise paid Avery an additional amount to obtain lien releases from sub-contractors. The liens were not released. In March 1995, sub-contractors began to place liens against the property. Avery also filed a lien against the property.

Tortoise attempted to obtain a release of the liens pursuant to I.C. § 45–518 by posting a bond in the amount of 150% of the outstanding liens. After Tortoise filed the appropriate documents, Avery amended its lien causing the bond posted to fall below the amount required by statute, and Tortoise's petition to release the liens was not approved. Subsequently, additional liens were filed against the property.

On March 3, 1995, Kessler took possession of the completed shell. Kessler made improvements to the shell and began operating the theater. Kessler and Tortoise also signed a lease (the lease) for the theater, with the term of the lease to be from March 3, 1995 through the intended April 14, 1995 closing date. On or about April 15, 1995, Kingen presented two documents (the documents) for Kessler to sign: (1) a second addendum to the purchase agreement, and (2) an addendum to the lease. The docu-

ments extended both the closing of the purchase and the term of the lease to September 15, 1995. Kessler made some modifications to the documents, signed them, and returned them to Kingen. Kingen apparently did not sign the documents.

On May 15, 1995, Kingen's attorney sent Kessler's attorney another proposed addendum to the lease by which Kessler would be required to contribute half of all legal fees, construction management fees and other costs and expenses which Tortoise would incur to complete the complex and to clear title to the property. Kessler did not accept the proposed addendum to the lease.

Tortoise was unable to deliver marketable title to Kessler on the April 14, 1995 closing date because of the liens against the property. Tortoise continued to fight the liens, and title to the property remained unmarketable.

Kessler sued Tortoise seeking specific performance of the purchase agreement and a permanent injunction against Tortoise enjoining Tortoise from transferring, mortgaging, or alienating the theater from Kessler. Tortoise counterclaimed seeking to recover possession of the theater. Both Kessler and Tortoise filed motions for summary judgment. The trial court granted summary judgment in favor of Tortoise, ruling that specific performance is not available to Kessler because the purchase agreement limited Kessler's remedy for Tortoise's failure to complete the sale to recovery of the earnest money and costs. The trial court also ruled: (1) because the time for performance under the purchase agreement had passed, Kessler was no longer entitled to possession under the purchase agreement, and (2) because the term of the lease had ended Tortoise was entitled to recover possession of the theater. Kessler appealed.

## II.

## SUMMARY JUDGMENT IS NOT APPROPRIATE BECAUSE THE PURCHASE AGREEMENT IS AMBIGUOUS CONCERNING SPECIFIC PERFORMANCE IN THE EVENT OF TORTOISE'S FAILURE TO CLOSE.

Kessler asserts that the trial court should not have granted summary judgment deny-

ing specific performance under the purchase agreement. We agree.

We first consider whether the purchase agreement was ambiguous concerning the availability to Kessler of specific performance when Tortoise failed to close. In doing so, we follow the following rules of construction:

"The primary objective in construing a contract is to discover the intent of the parties, and in order to effectuate this objective, the contract must be viewed as a whole and considered in its entirety. The primary consideration in interpreting an ambiguous contract is to determine the intent of the parties. The determination of a contract's meaning and legal effect are questions of law to be decided by the court where the contract is clear and unambiguous. However, where a contract is determined to be ambiguous, the interpretation of the document presents a question of fact which focuses upon the intent of the parties. The determination of whether a contract is ambiguous or not is a question of law over which we may exercise free review, and in determining whether a contract is ambiguous, our task is to ascertain whether the contract is reasonably subject to conflicting interpretation."

*Doyle v. Ortega,* 125 Idaho 458, 461, 872 P.2d 721, 724 (1994) (quoting *Bondy v. Levy,* 121 Idaho 993, 996–97, 829 P.2d 1342, 1345–46 (1992) (citations omitted)).

One of the issues in *Doyle* was whether the default section of a contract precluded the buyers from obtaining specific performance when the seller failed to consummate the sale. The portion of the default provision in *Doyle* concerning default by the seller stated:

If the Seller, having approved said sale fails to consummate the same as herein agreed, the Earnest Money shall be returned to the Buyer less such charges and other costs or fees incurred or committed for use by or on behalf of the Buyer hereunder and Seller shall pay for the cost of title insurance, escrow and legal fees, if any, and reimburse Buyer for that portion of the Earnest Money expended or com-

mitted on behalf of Buyer which cannot be refunded.

*Doyle,* 125 Idaho at 461, 872 P.2d at 724.

This provision specifically reserved remedies for the seller other than those stated in the clause, but did not reserve other remedies for the buyer. The Court concluded the default section was not ambiguous, and that the requirement that the seller return the earnest money to the buyer was inconsistent with specific performance. In *Doyle,* the Court ruled that the only reasonable interpretation of the contract was that upon default by the seller, the buyer was limited to the remedy stated in the default clause—return of earnest money. *Id.* at 462, 872 P.2d at 725.

In the present case, our reading of the default provision, the earnest money provision, and the title insurance provision leads us to the conclusion that the purchase agreement is reasonably subject to at least three reasonable and conflicting interpretations concerning the remedy that is available to Kessler in the circumstances presented here: (1) under the earnest money provision, Kessler is limited to return of the earnest money only if the failure to consummate the sale are due to circumstances beyond the control of Tortoise and Kessler; or (2) under the title insurance provision, Kessler is limited to return of the earnest money regardless of the reason for the failure to consummate the sale; or (3) because the default provision does not limit the Kessler's remedies, Kessler may seek specific performance. Because the purchase agreement is ambiguous, its interpretation presents a question of fact concerning which of the three provisions controls. *Doyle,* 125 Idaho at 461, 872 P.2d at 724. This distinguishes the present case from *Doyle,* where the Court concluded that the contract was not ambiguous concerning the buyer's remedy.

If the title insurance provision controls, Tortoise was entitled to summary judgment. If the default provision controls, Tortoise is not entitled to summary judgement. If the earnest money provision controls, there is a genuine issue of material fact concerning whether the liens against the property preventing the transfer of marketable title is a circumstance beyond the con-

trol of Tortoise and Kessler. This provision is closely akin to the doctrine of impossibility. In order to prove impossibility: (1) a contingency must occur; (2) performance must be impossible, not just more difficult or more expensive; and (3) the nonoccurrence of the contingency must be a basic assumption of the agreement. *Haessly v. Safeco Title Ins. Co.,* 121 Idaho 463, 465, 825 P.2d 1119, 1121 (1992). Whether the liens against the property made Tortoise's ability to convey marketable title impossible or merely more expensive is a genuine issue of material fact that would preclude summary judgment.

### III.

### CONCLUSION

We vacate the summary judgment dismissing Kessler's complaint and granting Tortoise restitution of the property and a writ of possession. We remand the case to the trial court for further proceedings.

We award Kessler costs, but not attorney fees, on appeal.

TROUT, C.J., and McDEVITT, SILAK, and SCHROEDER, JJ., concur.